956 P.2d 1285

**WAIMANALO VILLAGE RESIDENTS' CORPORATION, a Hawai'i nonprofit corporation, Plaintiff–Appellee,**

v.

**Clemens YOUNG and Linea Young, Defendants–Appellants.**

No. 19820.

Intermediate Court of Appeals of Hawai'i.

April 29, 1998.

eral Fair Housing Act and Section 504 of the Rehabilitation Act of 1973; and (4) Waimanalo Village's actions constituted a retaliatory eviction.

We conclude that the district court had jurisdiction to determine the merits of this case. However, we also conclude that the district court improperly terminated the Youngs' lease with Waimanalo Village. Accordingly, we reverse the Judgment for Possession entered by the district court on April 12, 1996 and vacate the Writ of Possession issued by the district court on the same day. Our disposition of this appeal renders it unnecessary to address the Youngs' remaining arguments.

Raymond E. Gurczynski, Legal Aid Society of Hawai'i, on the briefs, Honolulu, for Defendants–Appellants.

M. Anne Anderson and Gisela Iglesias, Neeley & Anderson, on the brief, Honolulu, for Plaintiff–Appellee.

Before BURNS, C.J., and WATANABE and ACOBA, JJ.

WATANABE, Judge.

In this summary possession case, Defendants–Appellants Clemens Young (Clemens) and Linea Young (Linea) (collectively, the Youngs) appeal from the Judgment for Possession entered by the District Court of the First Circuit (district court) on April 12, 1996, dispossessing them of the federally-subsidized housing unit which they had been leasing from Plaintiff–Appellee Waimanalo Village Residents' Corporation (Waimanalo Village) for over ten years.

The Youngs contend that: (1) the district court lacked subject matter jurisdiction over the parties and claims because Waimanalo Village's notice of termination was defective; (2) the district court abused its discretion when it dispossessed the Youngs of their housing unit because the evidence produced at trial did not support a finding that the Youngs materially breached their lease with Waimanalo Village; (3) Waimanalo Village and the court did not reasonably accommodate the Youngs in accordance with the Fed-

## BACKGROUND

### A. The Lease

This case stems from the alleged breach of a lease between the Youngs and Waimanalo Village. The Youngs, who both have disabilities and do not work, live on a fixed income. As part of a program sponsored by the federal government, the Youngs were able to rent a housing unit owned by Waimanalo Village for less than market value because the United States Department of Housing and Urban Development (HUD) made "tenant assistance payments" on their behalf to Waimanalo Village.

Although the Youngs had been living at the same housing unit for over ten years, the lease in question, which was executed by the Youngs and representatives of Waimanalo Village on June 29, 1995, had a an "initial term" that began on August 1, 1995 and ended on April 30, 1996. However, the lease provided that after the initial term ended, the lease "will continue for successive terms of one month periods, unless automatically terminated as permitted by Paragraph 23 of this [lease]." Moreover, pursuant to Paragraph 23, entitled "Termination of Tenancy," termination of a lease could only take place if certain grounds were present and specified procedural requirements were observed.

The obligations of the Youngs with respect to the maintenance of their housing unit were set forth in Paragraph 10b of the lease. Of relevance to this lawsuit are clauses 1, 4, and

5 of said paragraph, which obligated the Youngs to "keep the unit clean; ... not destroy, deface, damage, or remove any part of the unit, ... [and] give [Waimanalo Village] prompt notice of any defects in the plumbing, fixtures, appliances, ... or any other part of the dwelling unit[.]"

Additionally, paragraph 11 of the lease provided that "[w]henever *damage is caused by carelessness*, misuse, or neglect on the part of the [Youngs], [their] family, or visitors, the [Youngs agree] to pay ... the *cost of all repairs* ... and ... rent for the period the unit is damaged *whether or not the unit is habitable*," (emphases in lease), and paragraph 14 of the lease required the Youngs to "obey the House Rules" for Waimanalo Village. At the time the lease was entered into, fourteen such rules had been adopted, and the rules provided that failure to comply with the rules "shall be grounds for eviction from the premises." Of relevance to this appeal are the following rules:

2. All tenants will be responsible for the maintenance and cleaning of their individual houses and the yard and area surrounding their house....

\* \* \*

10. Any damage to the premises caused by the [Youngs] by moving of furniture or for misuse and/or neglect shall be repaired at the expense of the tenant causing the damage, unless such damage is covered by any applicable insurance policy.

\* \* \*

13. Any disputes arising under these rules shall be resolved and decided by the Resident Manager. If any tenant is dissatisfied by the decision of the Resident Manager, the dissatisfied tenant will follow the decision of the Resident Manager, but may bring the matter for a final decision before the Managing Agent.

### B. *The Inspection*

On September 27, 1995, the property manager for Waimanalo Village sent the Youngs

a letter informing them that the annual inspection of their housing unit would be held on Wednesday, October 4, 1995, at 9:00 a.m. By a letter delivered to the Youngs on October 12, 1995, Elizabeth Hibbett (Hibbett), the Property Manager for Waimanalo Village, advised the Youngs that their housing unit had not passed the annual physical interior inspection and, as a result, they were "in violation of section 10(b), (1,4,5)" of the lease. The letter listed a number of violations which had been noticed during the inspection and informed the Youngs that they could request a meeting with the Waimanalo Village Board of Directors to discuss the violations.

On October 24, 1995, Hibbett sent a letter to the Youngs, notifying them that the Waimanalo Village Board of Directors had granted them "until November 30, 1995 to make the necessary changes to [their] unit." The letter continued:

Please be further advised, ... that you will be held accountable for the cost of items needed to be fixed beyond normal wear and tear. You are not required to make any of the repairs on your own. However, you must provide ... Vickery with a list of items needing repair.

... Vickery and I will conduct a thorough inspection of both the interior and exterior of your unit on **November 30, 1995 at 9:00 a.m**....

On November 30, 1995 your unit must pass inspection. Failure to pass inspection will result in eviction proceedings.

(Emphasis in original.)

By a letter dated November 30, 1995, Hibbett[1] notified the Youngs that their housing unit had failed to pass the follow-up inspection. The letter informed the Youngs that:

Today, ... Vickery and I will complete a list of all repairs needed in your unit. We will present you will [sic] an estimated cost to complete all of the repairs. Upon receipt of the estimation you will be given the opportunity to accept or decline. If you accept our offer to repair your unit, the actual costs associated with the repairs will be assessed to your billing state-

---

1. The letter dated November 30, 1995 was actually signed by "Elizabeth Hibbett–Bell" (Hib-

bett). Hibbett explained at trial that she had gotten married and therefore changed her name.

ment. . . . Therefore, payment will be due for the repairs as they appear on your billing statement. Not all repairs will be done at once, hence, repair costs will show on your bill incrementally. Failure to keep up with payments due does and will constitute delinquency.

Should you choose to reject this final offer on behalf of the Waimanalo [Village] Board of Directors, the Board will be forced to turn your case over to their attorney's [sic] for further review and consultation.

Along with this letter, a Work Order Form was sent to the Youngs, informing them of what needed to be repaired in their housing unit and the estimated cost of these repairs. Specifically, the Work Order Form listed the following repairs and estimated costs:

| ITEM | COST |
| --- | --- |
| Replace 2 closet doors × paint × 1 bdrm door | $ 84.00 |
| Master Bath Vanity 6' baseboard | $ 12.79 |
| Hole 2nd. Bdrm. 1'x1' jip [sic] board 2x3x2 brace | $ 5.00 |
| Sand patch, cork × paint 3 window sills | $ 8.00 |
| Replace 10 floor tiles $.40 ea. × glue | $ 6.00 |
| Replace 10 Screen [sic] with frame | $ 150.00 |

\* \* \*

REMARKS:

This is a appox. [sic] figure considering unseen damage and tenant cleaning bathroom ceiling, painting noticeable needed areas etc. otherwise maintenance men will do and additional charges will be added.

The Youngs did not accept Waimanalo Village's proposal. By a letter dated December 7, 1995, the Youngs responded that they had previously requested that Waimanalo Village repair some of the same items listed in the Work Order Form but their requests had gone unheeded. Moreover, the Youngs stated that they could not agree to sign what they felt was a "blank check," since the amount required for the repairs was subject to change and the Youngs could not "agree to make payment every month not knowing what the payment will be."

The matter was thereafter turned over to Waimanalo Village's legal counsel.

C. *The "Notice of Violations"*

By a letter dated January 12, 1996, an attorney representing Waimanalo Village sent a demand letter to the Youngs notifying them of various alleged violations of their lease (Demand Letter). The Demand Letter, in relevant part, stated:

Notice is hereby given that you have violated your rental agreement by failing to maintain your dwelling unit. Recent inspections of your unit reveal that the unit has fallen into severe disrepair and neglect. Items that require replacement, repair and/or attention include:

1. Marked and indented floor tiles throughout the unit;

2. A hole in the wall located by the second entryway;

3. A hole in the second bedroom door;

4. The master bathroom vanity must be replaced;

5. Stained and gouged kitchen countertops [sic];

6. Soiled stove burners;

7. Torn or missing screens throughout the unit;

8. Excessive storage of personal property in and around the unit and the garage; and

9. The unit was not maintained as clean and safe as conditions permitted.

The Demand Letter also informed the Youngs that the "above-referenced incidents constitute material noncompliance with the terms and conditions of [the Youngs' lease] and are grounds for termination." The Youngs were given ten days from the day they received the letter to cure the problems specified in the letter and were told that any failure to remedy the problems would result in termination of the Youngs' lease and a "suit for possession" of the housing unit by Waimanalo Village.

On February 21, 1996, Waimanalo Village filed the Verified Complaint for Summary Possession, Assumpsit and Damages (complaint) against the Youngs which led to this appeal. An evidentiary hearing on Waimanalo Village's complaint was held on March 7, 1996 in the district court.

## D. *The March 7, 1996 Hearing*

At the hearing, Waimanalo Village's witnesses were Hibbett[2] and Vickery. They testified generally about the events that had led to the filing of the lawsuit and the nature of the Youngs' lease violations.

Thereafter, the Youngs orally moved "for a dismissal based on ... improper notice ... [on] [t]wo grounds: one, that the federal statute, as well as, actually the lease itself, requires that the items that are alleged to have been in material noncompliance be noted with specificity in the notice of termination." Second, the Youngs did not believe that they had been given "proper effective notice [of the] time of termination." The Youngs pointed out that the Demand Letter did not give "the time certain as to the termination date" and didn't give notice of "any termination at all[.]"

The district court denied the Youngs' motion, ruling that the Demand Letter had itemized the Youngs' lease violations with sufficient specificity to inform the Youngs of the nature of Waimanalo Village's concerns. The district court also ruled, as to the timing issue, that the lease did not require Waimanalo Village to provide the Youngs with thirty days' notice of the corrections to be made by them.

The Youngs then presented Clemens as their witness. Clemens testified that he and his wife, Linea, had been living in their unit for ten years and that the unit had been occupied before the Youngs moved into the unit. Clemens also testified that both he and Linea had disabilities[3] and that they lived on a fixed income.

Clemens was then questioned about the specific lease violations which had been listed in the Demand Letter. When asked about the cause of the marked and indented floor tiles throughout his unit (item 1), Clemens replied that the marks were caused by his prosthesis when the foot portion of his artifi-cial leg had broken off and he couldn't get the prothesis repaired for six months. Clemens explained that when he walked, a screw that protruded from the bottom of the broken prosthesis "caused the holes in the floor." Clemens agreed that he was "responsible for the indentions on the floor" and stated that he had bought a box of fifty tiles to make the necessary repairs. However, Clemens also testified that he did not feel he should be held responsible for all of the damaged tiles—only those tiles which he had damaged. Clemens explained that some of the tiles were damaged when Waimanalo Village "sent a repairman, and the repairman went underneath the house, put up braces to brace up the floor, and in doing so, he made the floor uneven, and when he did that, the tiles started to crack. This is by the bedroom, bathroom door."

As to the other items listed in the Demand Letter, Clemens testified that he had repaired the hole in the wall in the living room (item 2) and the hole in the door in his son's bedroom (item 3), cleaned the kitchen counter tops (item 5), and cleaned the stove and replaced the stove burners (item 6). He had also cleaned up his garage by taking two truckloads of items to the dump and giving away numerous boxes of items to friends and relatives, and when he was told that his garage was still not clean enough and that he needed to move everything at least two-and-a-half feet away from the house, he moved a motorcycle, a work bench, plants, and other items away from the house (item 8). Clemens also testified that he or his wife routinely vacuumed the floors, swept and mopped the floors, and cleaned the kitchen and wiped the counters (item 9).

As to item 4, Clemens testified that he did not feel he should be responsible for the replacement of the bathroom vanity because he had called Vickery numerous times about the problem:

---

2. At trial, Elizabeth Hibbett (Hibbett) testified that her name was "Elizabeth Bell." On voir dire examination, she explained that Hibbett was her maiden name and that Bell was her married name. For consistency purposes, we have referred to Hibbett by her maiden name throughout this opinion.

3. Clemens explained that his left leg had been amputated below his left knee and he wore a prosthetic leg, and that Linea suffered from among other things, asthma, diabetes and a "chronic-pneumonic condition."

I told her that the faucet was leaking, was leaking on to [sic] the cabinet, the cabinet was getting rot. And she sent one maintenance man in one time to put a new floor stripping on it, and that's the only repair they made to the vanity. And I have called her numerous times and made numerous complaints about that one cabinet, and they have done nothing about it.

With respect to item 7, Clemens stated that he and his wife should only be held responsible for repairing one screen. Clemens testified that there were currently no missing screens. Furthermore, he had informed Vickery at the time his housing unit had been inspected on October 4, 1995 that there was one screen missing because he "had just taken it off, washed it, and placed it outside to dry." Clemens stated that there were screens in his bedroom that had been separated from the frame because the rubber stripping had come out from the screens. However, he insisted that this condition was "normal wear and tear." Clemens also admitted that there were "at least two" frames that needed to be replaced because "the clips are so tight on the frame that when you try to take the clips off, ... you have to use so much pressure to take the clips off that you damage the frames." However, he believed he was only responsible for one frame and was willing to fix that frame.

4. On April 11, 1996, the district court filed its Findings of Fact, Conclusions of Law and Order, which reflected its oral ruling. Of relevance to this appeal are the following findings of fact:

I. The Court finds that as to Items F–1, above, the [Youngs] are responsible to repair said marked and dented [sic] floor tiles, but not those floor tiles presently missing.

J. As to Item F–2, since the damage to the wall has been repaired, this deficiency is no longer at issue.

K. As to Item F–3, the [Youngs] are responsible to repair the hole in the second bedroom door.

L. As to Item F–4, the Court is satisfied that the damage to the vanity is not the responsibility of [the Youngs] and therefore [Waimanalo Village] is responsible for its repair.

M. As to Item F–5, the Court is satisfied by the evidence presented by [Waimanalo Village] that the countertops are not stained and gouged except for normal wear and tear and resolves this dispute in favor of [the Youngs].

N. As to the soiled stove burners (Item F–6), the court is satisfied that the soiled stove

### E. *The District Court's Oral Ruling*

At the conclusion of the testimony and after considering the arguments of both counsels, the district court orally ruled,[4] in relevant part, as follows:

As to Item 1, as well as Item 3, ... the indented floor tiles and the hole in the second bedroom door, ... the Court is satisfied that those items have not been properly addressed as yet.

\* \* \*

As to Item 2, the Court is satisfied ... that the hole in the wall is fixed.

Item 4, as to the bathroom vanity, the Court is somewhat troubled as to what exactly the vanity is. There was no specific testimony from [Waimanalo Village] as to what part of the house is considered to constitute the vanity. There was a photograph submitted by the [Youngs] which indicated that the area in question was the sink assembly or the cabinet, and I'm going to have to accept that. [Clemens] has presented testimony that the damage was caused by water coming over the top. He says he called. [Waimanalo Village] says there's no record of it, but on balance, I'm going to resolve it in favor of [Clemens]. And again, I'm not sure if that is the vanity, but because of that uncertainty, I'm going to resolve that that has not been

has been cleaned and resolves this matter in favor of [the Youngs].

O. As to the torn or missing screens (Items F–7), [Waimanalo Village] and [the Youngs] presented contradictory evidence on the number of screens that needed repairs, as well as which party was responsible for said damages. After careful review of the evidence, the court resolves this disputed matter in favor of [Waimanalo Village].

P. [Waimanalo Village has] not proved to the satisfaction of this court that the deficiencies noted in F–8 have been violated, and the Court rules in favor of [the Youngs].

Q. As to Item F–9, [Waimanalo Village] has not met its burden that the unit was not maintained in as safe a condition as condition's [sic] permitted and the court resolves this matter in favor of [the Youngs]. However, [Waimanalo Village] did prove to the court's satisfaction that the premises were not maintained as clean as conditions permitted and resolves this matter in [Waimanalo Village's] favor.

established to the Court's satisfaction by a preponderance of the evidence that he is in violation of Number 4.

Number 5, from the testimony presented including the photographs, the Court is satisfied that those have been addressed. That is the counter tops in the kitchen.

Number 6, the stove burners appear to the Court's satisfaction to have been addressed based on his testimony, [Clemens] and the photographs.

And Number 7, there is a difference in the testimony between [Clemens] and [Waimanalo Village's] witnesses as to the condition of the screens.... The Court will resolve issues of credibility in favor of [Waimanalo Village] on that matter.

On Case Number 8, the Court is not satisfied that there is a sufficient rule or provision either in the lease or the house rules which addresses storage of personal property in and around the unit and garage. There are general provisions about keeping the unit clean. The Court finds that to be ambiguous.... So, the Court resolves Item 8 in favor of the [Youngs] absent any more specific provision which may be adopted by the association or the corporation.

As to Item Number 9, it is another issue of credibility as to the cleanliness of the unit. The Court will resolve those issues based of [sic] what I've heard in favor of [Waimanalo Village]. The Court is satisfied that the unit was not maintained in a clean condition. The court does not find that sufficient evidence has been presented as to safety issues. So only as to cleanliness is Number 9 resolved in favor of [Waimanalo Village].

Despite finding that the Youngs were in violation of various provisions of their lease, the district court was "not satisfied that as a matter of law, summary possession should be ordered under the circumstances presented in this case." The district court pointed out that the only exterior violation the Youngs had committed involved the screens. Moreover, there was "no specific evidence of health and safety concerns either to the tenants or to others in close proximity." In light of these concerns, the district court orally ruled as follows:

The [c]ourt will therefore do this, based on the [c]ourt's injunctive powers allowed under state law in summary possession actions, the [c]ourt will require [the Youngs] to address to [Waimanalo Village's] satisfaction, based upon inspections conducted by the managing agent and the resident manager, to address Items 1, 3, 7, and 9[5] as set forth in the notice of January 12th, 1996. Those conditions must be addressed within the next 30 days. [Clemens], one way or the other, you're going to have to find the resources and the help to take care of the tiles, and I mean all the tiles throughout the unit.

Clemens then sought a clarification of the court's ruling, and the following exchange took place:

[CLEMENS]: Not just the tiles that I made, that I damaged?

THE COURT: Well, I'm finding that all of the tiles need to be addressed. That is my finding.

[CLEMENS]: Because like I said, the tiles—

THE COURT: I understand you have a dispute as to some things in the flooring causing damage to the tiles, but I'm finding that everything—you can't just replace 85 percent, 99 percent and leave holes here and there, so—

[CLEMENS]: You mean the whole household, bedrooms and all?

THE COURT: Well, wherever there are marked and indented floor tiles, those are the ones that I'm addressing. Let's say marked and indented floor tiles, okay, for clarification purposes. Those are the ones which the landlord presumably will be able to identify: They were the ones that made the inspection and produced this notice.

[COUNSEL FOR WAIMANALO VILLAGE]: Your Honor, I hate to be hypertechnical, on missing tiles ...

---

5. Item 1 was the "[m]arked and indented floor tiles throughout the unit." Item 3 was "[a] hole in the second bedroom door." Item 7 was "[t]orn or missing screen throughout the unit." Item 9 was that "[t]he unit was not maintained as clean and safe as conditions permitted."

THE COURT: Pardon me?

[COUNSEL FOR WAIMANALO VILLAGE]: ... marked indented ·and missing cause [sic] there're [sic] some that. are missing.

·[COURT]: Well, that notice does not, unfortunately, address missing tiles. I'm just going to go by that. I will accede to [Clemens'] point, okay....

Further, the court ruled that

[s]uch breaches must be corrected by [the Youngs], at their expense, to the satisfaction of [Waimanalo Village's] managing agent by 5:00 p.m. on March 28, 1996.

A pre-inspection of the Premises shall be conducted by [Waimanalo Village] on March 21, 1996 at 5:00 p.m. to determine the status of [the Youngs'] compliance with [the] [c]ourt's order.

A final inspection shall be held by [the Youngs] at the Premises on March 28, 1996 at 5:00 p.m. to determine if [the Youngs] have corrected the breaches described ... [in the court's] Findings of Fact to the satisfaction of [Waimanalo Village's] managing agent. In the event that [the Youngs] do not correct all the breaches ... to the satisfaction of [Waimanalo Village's] managing agent, [Waimanalo Village] may file a motion for the issuance of a writ of possession and judgment for possession as a result of [the Youngs'] failure to comply with this [c]ourt's order.[6]

(Footnote added.)

· The court then set a compliance hearing for April 11, 1996 and orally informed the Youngs that if they had not complied with the court's order by the March 28, 1996 final inspection date, Waimanalo Village could file a motion prior to the April 11, 1996 hearing, requesting the entry of a Judgment for Possession and the issuance of a Writ of Possession.

### F.  *The Proof of Compliance Hearing*

On April 2, 1996, following its March 28, 1996 final inspection of the Youngs' housing unit, Waimanalo Village filed a "Motion for Issuance of a Writ of Possession and Judgment for Possession Against [the Youngs]." In a memorandum in support of this motion, Waimanalo Village stated that although the Youngs had replaced and repaired the screens, they were still in breach of their lease due to the following deficiencies: (1) numerous marked and indented floor tiles throughout the housing unit were not repaired or replaced and the replacement tiles installed by .the Youngs were "of a significantly different color and design," (2) although the hole in the second bedroom door was patched, the patching job left an "obvious bump in the wall ... [which] requires sanding and painting to make it less conspicuous," and (3) the premises were "not maintained as clean as conditions allowed. Particularly, one of the toilets evidenced dark staining which required cleaning."

At the April 11, 1996 proof of compliance hearing, the only witness to testify was Vickery. Vickery stated that at the March 21, 1996 inspection, she discovered that there remained "between 20 and 40 tiles" that were "indented or otherwise marked" that had not yet been replaced by the Youngs. Additionally, the tiles that had been replaced by the Youngs were of a different color than the existing tiles in the unit. Vickery admitted that she had never communicated with the Youngs or their attorney as to which tiles should be replaced and conceded that even the replacement tiles which Waimanalo Village's own workers had used to repair the Youngs' unit were not of the same color or design as the original tiles. According to Vickery, however, the replacement tiles used by Waimanalo Village were closer to the original color than that used by the Youngs.

As to the hole in the door in the Youngs' bedroom, Vickery testified that although the door had been patched by the Youngs, it was "slightly bumped instead of, you know, being flat like it should be." When asked to clarify how far the bump protruded, Vickery testified, "maybe an eighth" of an inch. She also admitted that "the repair was done pretty

---

**6.**  The district court's oral order was subsequently reduced to a written order, but the written order (which was part of the district court's Findings of Fact, Conclusions of Law and Order in this case) was not filed until April 11, 1996.

good except that it should have been sanded a bit more before [being] painted."

After considering all the testimony and arguments of counsel, the court found that there was insufficient evidence presented at the hearing to rule on whether or not the Youngs had properly repaired the hole in the second bathroom door or properly cleaned the apartment. The court determined, however, that the Youngs "have not complied with the Court's March 22, 1996 Order and have not properly replaced all marked and dented [sic] floor tiles." The court emphasized that it was not basing its ruling "so much on the aesthetics as . . . on the testimony that there were a number of tiles which remained in the same condition as they were previously."

Thereafter, on April 12, 1996, the district court entered a Judgment for Possession and issued a Writ of Possession in favor of Waimanalo Village. The court, after confirming with Waimanalo Village that it had decided not to renew its lease with the Youngs, made both the Judgment for Possession and Writ of Possession effective on April 30, 1996, the last day of the term of the lease.

### G. Subsequent Proceedings

On April 23, 1996, the Youngs filed a motion pursuant to District Court Rules of Procedure (DCRP) Rule 54(b), seeking to certify the district court's (1) March 20, 1996 Findings of Fact, Conclusions of Law and Order and (2) oral ruling on April 11, 1996 as final for appeal purposes. On April 26, 1996, the Youngs filed a Notice of Appeal. Subsequently, the Youngs filed for bankruptcy in the federal bankruptcy court, and on April 29, 1996, the Youngs filed a Notice of Bankruptcy in the district court, notifying the court and Waimanalo Village that further proceedings in the case were automatically stayed.

■ On May 2, 1996, the district court granted the Youngs' DCRP Rule 54(b) motion.[7] On August 15, 1996, the United States Bankruptcy Court granted Waimanalo Village's motion for relief from the automatic stay that protected the Youngs in bankruptcy.

## DISCUSSION

### A. The Jurisdiction Issue

■ The Youngs contend that the district court lacked jurisdiction over this case because Waimanalo Village failed to properly notify them of the grounds for terminating their lease with enough detail to allow them to prepare a defense. According to the Youngs, the Demand Letter sent to them by Waimanalo Village's attorney on January 12, 1996 "was conclusionary [sic], lacked factual underpinnings," and was "ambiguous, uncertain, and vague" because the letter did not specify (1) what screens or tiles the Youngs had to repair, (2) what standards the Youngs had to meet in order for their housing unit to be considered "clean and safe as conditions permitted," and (3) what "excessive storage of personal property in and around the unit and garage" required "replacement, repair and/or attention." Therefore, the Youngs maintain, the district court lacked subject matter jurisdiction to decide this case.

■ We disagree with the Youngs. "The existence of jurisdiction is a question of law that we review de novo under the right/wrong standard." Lester v. Rapp, 85 Hawai'i 238, 241, 942 P.2d 502, 505 (1997) (citation omitted).

Pursuant to HRS § 666-6 (1993), summary possession proceedings are required to be

---

7. Pursuant to a Notice of Bankruptcy filed in the district court on April 29, 1996, counsel for Defendants–Appellants Clemens and Linea Young (collectively, the Youngs) provided notice that "an automatic stay as to the continuance of any judicial matter commenced prior to the bankruptcy is stayed." Since the automatic stay as to this case was not lifted until August 15, 1996, the district court was not authorized, on May 2, 1996, to rule on the Youngs' District Court Rules of Procedure (DCRP) Rule 54(b) motion. There-

fore, a question is presented as to whether the Youngs' appeal is premature. Since the district court entered a judgment for possession, accompanied by a writ of possession on April 12, 1996, however, and since the Youngs' appeal was filed on April 26, 1996, we hold that we have appellate jurisdiction under the Forgay Doctrine principles articulated by the Hawai'i Supreme Court in Ciesla v. Reddish, 78 Hawai'i 18, 889 P.2d 702 (1995).

prosecuted "in the district court of the circuit wherein the land and premises in question are situated." Accordingly, we hold, as a matter of law, that the district court had exclusive subject matter jurisdiction over the instant summary possession action.

■ The Youngs maintain that the cases of *Escalera v. New York City Housing Authority,* 425 F.2d 853, *cert. denied* 400 U.S. 853, 91 S.Ct. 54, 27 L.Ed.2d 91 (1970), and *Housing Authority of the County of King v. Saylors,* 19 Wash.App. 871, 578 P.2d 76 (1978), support their position that a landlord's failure to comply with HUD regulations and provide adequate notice to a tenant of the termination of his or her lease divests the trial court of jurisdiction of the termination of lease action. We do not read either case as supporting such a proposition. Both cases merely provide that a landlord's failure to provide a proper notice of termination will preclude the successful termination of the tenant's lease. However, a landlord's failure to provide a tenant with proper notice of termination of a lease does not mean that a trial court is divested of jurisdiction to decide the merits of the termination of lease action.

### B. The Propriety of the Judgment for Possession and the Writ of Possession in Favor of Waimanalo Village

■ As a general rule, lease provisions allowing for forfeitures or terminations of the lease are disfavored by the courts and are strictly construed against the lessor. 49 Am. Jur.2d *Landlord and Tenant* § 290, at 267–68 (1995). Similarly, it is well-settled that statutes which authorize a lessor to terminate a lease in case of certain derelictions on the part of the lessee must be strictly complied with to bring about the termination of a lease. *Id.* § 292, at 269. "Thus, a forfeiture may not be effected where the landlord fails to make a demand that is sufficiently unequivocal, or where a statutory requirement as to notice is not properly followed, such that notice is defective." *Id.* § 292, at 269–70 (footnotes omitted).

At the conclusion of the April 11, 1996 proof of compliance hearing, the district court found that the only problem remaining with the Youngs' housing unit was that be-

tween twenty and forty marked and indented tiles had not been replaced by the Youngs. However, because the district court had previously ordered the Youngs to replace "all" of the marked and indented tiles in the unit, and the Youngs had not replaced all of the marked and indented tiles as ordered, the court ruled that the Youngs "have not complied with the [c]ourt's March 22, 1996 order and have not properly replaced all marked and dented [sic] floor tiles."

Upon inquiring about the status of the Youngs' lease, the court was informed by counsel for Waimanalo Village that the initial term of the lease would expire on April 30, 1996 and that Waimanalo Village, because of the alleged breaches of the lease by the Youngs, intended to terminate the lease on April 30, 1996. Counsel for Waimanalo Village then stated:

> Basically, [the Youngs] have breached the lease, and we have a basis not to renew. The only issue is that we would have to file another court action at expense.... That's why we were hoping to get relief from this [c]ourt so that we would not have to duplicate thousands of dollars in expense to have a tenant—it's already obligated to do without a court order.

The district court then granted Waimanalo Village the relief it sought and entered a Judgment for Possession and issued a Writ of Possession, both effective on April 30, 1996.

■ In granting such relief, the district court apparently believed, based on the representations of Waimanalo Village's counsel, that Waimanalo Village had the unfettered option *not* to renew its lease with the Youngs and that Waimanalo Village had exercised said option. Accordingly, the district court terminated the Youngs' lease to coincide with the end of the lease term. As noted above, however, the lease contained an express provision that after the initial term ended, the lease "will continue for successive terms of one[-]month periods, unless automatically terminated as permitted by paragraph 23 of this [lease]." By the very terms of the lease, therefore, the Youngs' lease could only be

terminated in accordance with paragraph 23 of the lease.

Because our review of the record indicates that (1) the Youngs were not properly notified that their lease was being terminated and (2) proper grounds did not exist for terminating the Youngs' lease, we conclude that the Youngs' lease was not terminated in accordance with paragraph 23 of the lease and, therefore, the district court erred in granting the Judgment for Possession and issuing the Writ of Possession.

### 1. *The Youngs Did Not Receive Proper Notification of the Termination of Their Lease*

a.

Paragraph 23.c. of the lease required Waimanalo Village to comply with the following procedure to terminate its lease with the Youngs:

c. *If [Waimanalo Village] proposes to terminate this [lease], [Waimanalo Village] agrees to give the [Youngs] written notice of the proposed termination.* If [Waimanalo Village] is terminating this agreement for "other good cause", the termination notice must be mailed to the [Youngs] and hand-delivered to the dwelling unit in the manner required by HUD at least 30 days before the date the [Youngs] will be required to move from the unit. Notices of proposed termination for other reasons must be given in accordance with any time frames set forth in State and local law. Any HUD required notice period may run concurrently with any notice period required by State or local law. All termination notices must:

1) specify the date this [lease] will be terminated;

2) state the grounds for termination with enough detail for the [Youngs] to prepare a defense;

3) advise the [Youngs] that [they have] 10 days within which to discuss the proposed termination of tenancy with [Waimanalo Village] . . . .; and

4) advise the [Youngs] of [their] right to defend the action in court.

(Emphasis added.)

The foregoing termination procedure was not complied with in this case. The Demand Letter sent to the Youngs by Waimanalo Village's attorney notified the Youngs that they had "violated [their] rental agreement by failing to maintain [their] dwelling unit." The letter also informed the Youngs of the violations that "require[d] replacement, repair and/or attention[.]" The letter further stated, in relevant part, as follows:

Please be advised that the above-referenced incidents constitute material noncompliance with the terms and conditions of your rental agreement and are grounds for termination. Be informed that pursuant to Hawaii [Hawai'i] Revised Statutes Sections 521–69 and 521–51, if you continue to fail to remedy your material noncompliance after ten (10) days of receipt of this letter, your rental agreement will be terminated and a suit for possession of the Premises will be immediately commenced. . . .

Be informed that in the event of termination of your rental agreement, you will have ten (10) days within which to discuss the termination of your tenancy with Waimanalo Village Residents' Corporation. The ten (10) day period will begin on the earlier of the date the notice was hand-delivered to the unit or the day after the date the notice is mailed. If you request a meeting with Waimanalo Village Residents' Corporation within that time period, a representative of Waimanalo Village Residents' Corporation will meet with you. Please be advised that if a summary possession (eviction) and assumpsit and damages action is filed against you, you will have the right to defend the action in court.

Although the Demand Letter informed the Youngs that they were in violation of the lease and that their failure to cure the lease violations would be considered grounds for termination of the lease, the Demand Letter did not notify the Youngs that their lease was actually being terminated. Indeed, the letter, in conformity with Paragraph 23.c. of

the lease, specifically told the Youngs that in the event they failed to cure the noted violations within ten days, they would be deemed in material noncompliance with the lease and their lease would be terminated and summary possession proceedings brought against them. The letter also assured the Youngs that in the event their lease was terminated, they would have ten days from receiving notice of the termination to discuss the matter with Waimanalo Village.

Despite the process outlined in the Demand Letter and the lease, Waimanalo Village filed this summary possession proceeding against the Youngs without notifying them that their lease was being terminated, specifying when termination was to take place, and providing them with an opportunity to meet with Waimanalo Village. We conclude, therefore, that the Youngs were not properly notified that their lease was being terminated.

b.

█ Even if the Demand Letter could reasonably be construed as a notice to the Youngs that their lease was being terminated, we conclude that the notice failed to properly apprise the Youngs of the exact nature of their violation with respect to the marked and indented tiles, the sole basis upon which the district court terminated the Youngs' lease.

In *Hawaiian Elec. Co. v. DeSantos*, 63 Haw. 110, 115, 621 P.2d 971, 975 (1980), the Hawai'i Supreme Court held that "[t]o effect the termination of a lease, ... the notice must be so certain that it cannot be reasonably misunderstood." In this case, the record indicates that the Youngs were understandably confused as to what tiles they were required to replace. Following the inspection of the Youngs' housing unit by Waimanalo Village representatives on November 30, 1995, Waimanalo Village presented to the Youngs a work order, proposing to replace the problematic tiles. The work order proposed to "[r]eplace 10 floor tiles" at a total

cost of $6. At the time of the work order, therefore, Waimanalo Village representatives apparently believed that only ten floor tiles needed to be replaced throughout the whole housing unit. In the Demand Letter sent by counsel for Waimanalo Village on January 12, 1996, however, the Youngs were informed that they must replace "[m]arked and indented floor tiles throughout the unit[.]" After the March 7, 1996 hearing, the district court added to the Youngs' confusion by ruling that the Youngs were required to replace all of the marked and indented tiles in the unit, because "you can't just replace 85 percent, 99 percent and leave holes here and there...." The district court then gave the Youngs until March 27, 1996 to replace all "marked and indented floor tiles ... the ones which the landlord presumably will be able to identify ... the ones that made the inspection and produced this notice [of violations]."

At the April 11, 1996 hearing on Waimanalo Village's Motion for Judgment for Possession, Vickery conceded that the Youngs were never specifically told which tiles were "marked and indented" and in need of replacement. Vickery also testified that the Youngs had failed to replace marked and indented tiles in "just about the entire floor of the third bedroom and some in the dining room area," an area of "approximately nine feet by nine feet," far in excess of the ten tiles that Waimanalo Village had originally proposed to replace at a cost of $6.

### 2. Proper Grounds Did Not Exist for Termination of the Youngs' Lease

█ The Youngs argue that the district court erred in granting Waimanalo Village's motion for Judgment for Possession and a Writ of Possession because, based on the evidence presented below, insufficient grounds existed for the termination of their lease. We agree.

According to Paragraph 23 of the lease, which essentially incorporates the requirements of 24 CFR § 880.607(a) and (b),[8] the

---

8. At the time the lease was entered into, 24 CFR § 880.607 provided, in relevant part, as follows:
(a) *Applicability.* The provisions of this section apply to all decisions by an owner to

terminate the tenancy of a family residing in a unit under Contract during or at the end of the family's lease term.

HUD regulation setting forth the grounds and procedures for terminating the tenancy of a tenant with disabilities residing in a HUD-subsidized unit:

b. Any termination of this [lease] by [Waimanalo Village] must be carried out in accordance with HUD regulations, State and local law, and the terms of this [lease]. [Waimanalo Village] may terminate this [lease] only for:

1) criminal activity that threatens the health safety, or right to peaceful enjoyment of the premises by other tenants, or any drug-related criminal activity on or near such premises, engaged in by a tenant, any member of the tenant's household, or any guest or other person under the tenant's control; or

2) [The Youngs'] material noncompliance with the terms of this [lease]. [T]he term material noncompliance with the lease includes: (1) one or more substantial violations of the lease; (2) repeated minor violations of the lease that: (a) disrupt the livabili-

ty of the project, (b) adversely affect the health or safety of any person or the right of any tenant to the quiet enjoyment of the leased premises and related project facilities, (c) interfere with the management of the project, or (d) have an adverse financial effect on the project; ...

3) the [Youngs'] material failure to carry out obligations under any State Landlord and Tenant Act; or

4) other good cause, which includes but is not limited to the [Youngs'] refusal to accept [Waimanalo Village's] proposed change to this [lease]. Terminations for "other good cause" may only be effective as of the end of any initial or successive term.

Waimanalo Village argues that the Judgment for Possession and the Writ of Possession were proper because the Youngs were in material noncompliance with their lease (ground 2) and in violation of the State Landlord–Tenant Code (ground 3). However, Waimanalo Village's claim is unsupported by the record.

(b) *Entitlement of Families to occupancy*— (1) *Grounds.* The owner may not terminate any tenancy except upon the following grounds:
(i) Material noncompliance with the lease;
(ii) Material failure to carry out obligations under any State landlord and tenant act;
(iii) Other good cause, which may include the refusal of a family to accept an approved modified lease form.... No termination by an owner will be valid to the extent it is based upon a lease or a provisions [sic] of State law permitting termination of a tenancy solely because of expiration of an initial or subsequent renewal term. All terminations must also be in accordance with the provisions of any State and local landlord tenant law and paragraph (c) of this section.
* * *
(3) *Material noncompliance.* (i) Material noncompliance with the lease includes:
(A) One or more substantial violations of the lease; or
(B) Repeated minor violations of the lease that disrupt the livability of the building; adversely affect the health or safety of any person or the right of any tenant to the quiet enjoyment of the leased premises and related facilities; interfere with the management of the building or have an adverse financial effect on the building.
(ii) Failure of the family to timely submit all required information on family income and composition, including failure to submit required evidence of citizenship or eligible immigration status (as provided by 24 CFR part 5), failure to disclose and verify Social Security Numbers (as provided by 24 CFR part 5), failure to sign and submit consent forms (as provided by 24 CFR part 5), or knowingly providing incomplete or inaccurate information, shall constitute a substantial violation of the lease.
Subparagraph (b) of the foregoing rule was amended in 1996 to renumber subparagraph (b)(1)(iii) as subparagraph (b)(1)(iv) and add a new subparagraph (b)(1)(iii) to read as follows:
(iii) Any criminal activity that threatens the health, safety, or right to peaceful enjoyment of the premises by other residents; any criminal activity that threatens the health, safety, or right to peaceful enjoyment of their residences by persons residing in the immediate vicinity of the premises; any criminal activity that threatens the health, or safety of any on-site property management staff responsible for managing the premises; or any drug-related criminal activity on or near such premises, engaged in by a resident, any member of the resident's household, or any guest or other person under the resident's control shall be grounds for termination of tenancy.
61 Fed.Reg. 47382 (1996).

a. *Whether the Youngs were in material noncompliance with the terms of their lease.*

According to the terms of the lease, the Youngs would be in "material noncompliance with the lease" if there was evidence of either "one or more substantial violations of the lease" or "repeated minor violations" of the terms of the lease that disrupted the livability of the project, adversely affected the health or safety of any person or the right of any tenant to the quiet enjoyment of the leased premises and related project facilities, interfered with the management of the project, or had an adverse financial effect on the project.

The dispositive issue, therefore, is whether the failure of the Youngs to replace the twenty to forty tiles constitutes a "substantial violation" or "repeated minor violations" of their lease.

(1) *The evidence does not indicate that the Youngs had committed one or more substantial violations of the lease.*

We conclude at the outset that the Youngs' failure to replace the tiles was not, as a matter of law, a "substantial violation" of their lease.

We note, first of all, that the Youngs' failure to replace the tiles does not constitute a "substantial violation" of the lease within the meaning of 24 CFR § 880.607(b)(3)(ii).[9] Moreover, under relevant case law, the Youngs' conduct would not be considered substantial enough to justify termination of the lease. In *North Shore Plaza Assocs. v. Guida,* 117 Misc.2d 778, 780, 459 N.Y.S.2d 685, 687 (N.Y.Civ.Ct.1983), the New York Civil Court, after surveying the case law on what constitutes "substantial violation of a lease," observed:

> Case law has held that "substantial" is a word of general reference which takes on color and precision from its total contex[t].

"Substantial violation" has been found to require a violation which causes loss to the landlord or one which affects a real interest of the landlord.

\* \* \*

... Breaches of a tenancy which have been found to be substantial include failure to pay rent, use of the premises for a purpose other than set forth in the lease, permitting an unauthorized person to reside in the premises, and unauthorized or illegal alterations in the demised premises.

(Citations omitted.) In this case, the Youngs' objectionable conduct does not resemble the type of activity which has been found to constitute a "substantial violation of a lease."

(2) *The Youngs' failure to replace all the problematic tiles to the satisfaction of Waimanalo Village's representatives did not constitute repeated minor violations of the Youngs' lease.*

Although no Hawai'i cases have dealt with the issue of what constitutes "repeated minor violations" of a lease, several out-of-state cases have shed some light on this issue. In *North Shore Plaza Assocs., supra,* for example, the Civil Court of the City of New York was called upon to determine whether a landlord was entitled to evict a tenant for material noncompliance of the rental agreement. Because the rental unit was federally subsidized, termination of the rental agreement was governed by 24 U.S.C. § 450(c), which defined "material noncompliance with the rental agreement" almost identically to 24 CFR § 880.607(b)(3)(A) and (b). Although the landlord alleged fourteen instances of the tenant's breach of the lease, proof was only offered by the landlord as to three of the instances alleged, and only two instances [10] were deemed by the court to be attributable to the tenant. The court held that while the fourteen instances, if proved, may have been sufficient to constitute "repeated minor viola-

---

9. See footnote 8.

10. The two instances of conduct that the court found to be substantiated by the landlord which were held to violate the lease were that (1) the tenant's son had engaged in an act of "sodomy" with another tenant's son, and (2) the tenant's

son had gotten into an altercation with a security guard employed at the apartment complex and had used profanity toward that security guard. *North Shore Plaza Assocs. v. Guida,* 117 Misc.2d 778, 781, 459 N.Y.S.2d 685, 687 (N.Y.Civ.Ct. 1983).

tions," "[t]wo incidents cannot, as a matter of law, be considered to constitute repeated violations of the rental agreement." 117 Misc.2d at 781, 459 N.Y.S.2d at 687.

In *Mid–Northern Management, Inc. v. Heinzeroth*, 234 Ill.App.3d 240, 174 Ill.Dec. 784, 599 N.E.2d 568 (1992), the landlord of a federally-subsidized apartment complex brought a forcible entry and detainer action against a tenant, alleging nine violations of the lease by the tenant and her son between June 7 and June 13, 1991. *Id.*, 174 Ill.Dec. at 785–86, 599 N.E.2d at 569–70. The alleged violations included various instances of loud noise coming from the tenant's apartment, unruly conduct by the tenant's son, and an allegation that the tenant was allowing an unauthorized person to live in her apartment. *Id.* As in this case, eviction procedures were governed by 24 CFR § 880.607. Although the trial court in *Heinzeroth* determined that the tenant had committed repeated minor violations of the lease and accordingly had awarded possession of the premises to the landlord, *id.*, 174 Ill.Dec. at 787, 599 N.E.2d at 571, the Illinois Court of Appeals refused to hold any of the tenant's son's actions against her. The appellate court also held that even if there was evidence that on several instances, the tenant had allowed loud noises to emanate from her unit, such evidence was not sufficient to constitute "repeated minor violations." *Id.*, 174 Ill.Dec. at 790, 599 N.E.2d at 574. The court stated:

> "Material noncompliance" requires a pattern of repeated minor violations of the lease, not isolated incidents. The handful of minor incidents described here, occurring over a short span of time and in the absence of prior notice to [the tenant] that her conduct was disturbing to neighbors, does not establish a pattern of violations.

*Id.* (citation omitted).

Finally, in *Fairview Co. v. Idowu*, 148 Misc.2d 17, 559 N.Y.S.2d 925 (N.Y.Civ.Ct.

1990), the Civil Court of the City of New York addressed the issue of whether or not certain acts by a tenant of a federally-subsidized housing project constituted repeated minor violations sufficient for the landlord to terminate the tenant's lease. The court initially determined that the notice of termination was not "sufficiently specific to enable [the tenant] to prepare a defense" as to all but one of the alleged lease violations. *Id.*, 559 N.Y.S.2d at 929. All that was left before the court, therefore, was a single instance in which the tenant had allowed water from her bathroom to overflow and flood her apartment. *Id.* Although the court held that this incident, by its nature, constituted a "minor violation of the lease," it also concluded that the incident "was a single, not a repeated violation" and thus did not constitute grounds for terminating the tenant's lease. *Id.*, at 930.

In this case, the district court found that the only violation of the lease which had not been cured by the Youngs was that twenty to forty marked and indented tiles had not been replaced by the Youngs. While such a violation could certainly be considered a "minor violation" of the lease, it is "a single, not a repeated violation," *id.*, and thus does not constitute adequate grounds for termination of the Youngs' lease.

(3) *Whether the Youngs were in violation of HRS § 521–51 (1993) of the Landlord–Tenant Code.*

■ On appeal, Waimanalo Village argues that even if the Youngs were not in material noncompliance with the terms of their lease, the fact that the Youngs damaged the tile in the unit constituted a violation of paragraphs 6, 7, and 8 of HRS § 521–51 (1993) [11] of the Landlord–Tenant Code, and

11. HRS § 521–51 (1993) provides:

**Tenant to maintain dwelling unit.** Each tenant shall at all times during the tenancy:

(1) Comply with all applicable building and housing laws materially affecting health and safety;

(2) Keep that part of the premises which the tenant occupies and uses as clean and safe as the conditions of the premises permit;

(3) Dispose from the tenant's dwelling unit all rubbish, garbage, and other organic or flammable waste in a clean and safe manner;

(4) Keep all plumbing fixtures in the dwelling unit or used by the tenant as clean as their condition permits;

(5) Properly use and operate all electrical and plumbing fixtures and appliances in the dwelling unit or used by the tenant;

pursuant to Paragraph 23 of the lease, would be an alternative ground for the court to have granted their motion for a Writ of Possession of the Youngs' unit. Waimanalo Village's argument is without merit.

HRS § 521–69 (1993) of the Landlord–Tenant Code limits the remedies available to a landlord for a tenant's violation of HRS § 521–51, in relevant part, as follows:

> **Landlord's remedies for tenant's waste, failure to maintain, or unlawful use.** (a) If the tenant is in material noncompliance with section 521–51, the landlord, upon learning of any such noncompliance and after notifying the tenant in writing of the noncompliance and allowing a specified time not less than ten days after receipt of the notice, for the tenant to remedy the noncompliance:
>
> (1) *May terminate the rental agreement* and bring a summary proceeding for possession of the dwelling unit or any other proper proceeding, action, or suit for possession *if the tenant is in material noncompliance with section 521–51(1);* or ·
>
> (2) May remedy the tenant's failure to comply and bill the tenant for the actual and reasonable cost of such remedy if the noncompliance can be remedied by the landlord by cleaning, repairing, replacing a damaged item, or the like, which bill shall be treated by all parties as rent due and payable on the next regular rent collection date or, if the tenancy has terminated, immediately upon receipt by the tenant.

(Emphases added.) Pursuant to HRS § 521–69(a), therefore, a landlord may terminate a lease for a tenant's noncompliance with the tenant's obligations under HRS § 521–51 only if the tenant has failed to

(6) Not permit any person on the premises with the tenant's permission to wilfully destroy, deface, damage, impair, or remove any part of the premises which include the dwelling unit or the facilities, equipment, or appurtenances thereto, nor oneself do any such thing;

(7) Keep the dwelling unit and all facilities, appliances, furniture, and furnishings supplied therein by the landlord in fit condi-

materially "[c]omply with all applicable building and housing laws materially affecting health and safety" under HRS § 521–51(1). A landlord's remedies for a tenant's failure to comply with the other obligations imposed upon the tenant pursuant to paragraphs 2 through 8 of HRS § 521–51 are limited to correcting the failure and billing the tenant for the cost of correction.

In this case, there was no evidence that the Youngs' failure to replace the damaged tiles constituted a violation of "applicable building and housing laws materially affecting health and safety." Indeed, the district court expressly found that the Youngs' failure to replace the tile did not present a threat to health or safety. Accordingly, Waimanalo Village was not authorized under the Landlord–Tenant Code to terminate the Youngs' lease for failure to replace the tiles.

### CONCLUSION

In light of the foregoing discussion, we reverse the Judgment for Possession entered by the district court on April 12, 1996 and vacate the Writ of Possession issued by the district court on the same date.

tion, reasonable wear and tear excepted; and

(8) Comply with all obligations, restrictions, rules, and the like which are in accordance with section 521–52 and which the landlord can demonstrate are reasonably necessary for the preservation of the property and protection of the persons of the landlord, other tenants, or any other person.